UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS
WICHITA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 11-CV-1291-JTM-JPO |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| COFFEYVILLE RESOURCES | ) | |
| REFINING & MARKETING, LLC | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**COMPLAINT FOR CIVIL PENALTIES,
INJUNCTIVE RELIEF, AND COST RECOVERY**

The United States of America, by authority of the Attorney General of the United States and through the undersigned attorneys, acting at the request of the Administrator of the United States Environmental Protection Agency ("EPA") and the United States Coast Guard ("Coast Guard"), files this Complaint and alleges as follows:

**NATURE OF THE ACTION**

1.      This is a civil action under Section 113 of the Clean Air Act ("CAA"), 42 U.S.C. § 7413; Sections 309 and 311 of the Clean Water Act ("CWA"), 33 U.S.C. §§ 1319, 1321; and Sections 1002, 1015 and 1017 of the Oil Pollution Act of 1990 ("OPA"), 33 U.S.C. §§ 2702, 2715, 2717, against Defendant Coffeyville Resources Refining & Marketing, LLC ("Defendant" or "CRRM").

**JURISDICTION, AUTHORITY, VENUE AND NOTICE TO THE STATE**

2.      This Court has jurisdiction over the subject matter of this action and over the parties pursuant to 28 U.S.C. §§ 1331, 1345, and 1355; Section 113(b) of the CAA, 42 U.S.C. § 7413(b);

Sections 309(b), 311(b)(7)(E), (e)(2) and (n) of the CWA, 33 U.S.C. §§ 1319(b), 1321(b)(7)(E), (e)(2) and (n); and Section 1017(b) of the OPA, 33 U.S.C. § 2717(b).  The Court has personal jurisdiction over the parties to this action.

3.    Authority to bring this action on behalf of the United States is vested in the United States Department of Justice pursuant to Sections 113(b) and 305 of the CAA, 42 U.S.C. §§ 7413(b) and 7605; Section 506 of the CWA, 33 U.S.C. § 1366; and 28 U.S.C. §§ 516 and 519.

4.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b), (c), and 1395(a); Section 113(b) of the CAA, 42 U.S.C. § 7413(b); Sections 309(b) and 311(b)(7)(E) of the CWA, 33 U.S.C. §§ 1319(b), 1321(b)(7)(E); and Section 1017(b) of the OPA, 33 U.S.C. § 2717(b), because Defendant does business in this District and the events giving rise to the claims alleged herein occurred in this District.

5.    Actual notice of the commencement of this action has been given to the State of Kansas pursuant to Section 113(b) of the Clean Air Act, 42 U.S.C. § 7413(b) and Section 309(b) of the Clean Water Act, 33 U.S.C. §1319(b).

## **DEFENDANT**

6.    Defendant is a Delaware limited liability company and registered in Kansas as a foreign limited liability company.  The Kansas Secretary of State's office lists Defendant as active and in good standing.

7.    Defendant is a "person" as defined in Section 302(e) of the CAA, 42 U.S.C. § 7602(e); in Section 311(a)(7) of the CWA, 33 U.S.C. § 1321(a)(7); in Section 1001(27) of the OPA, 33 U.S.C. § 2701(27); and in applicable federal and state regulations promulgated pursuant to these statutes.

8.    Defendant is the "owner" and "operator" of an oil refinery ("the Refinery"), located at 400 North Linden Street in Coffeyville, Kansas, within the meaning of Section 112(a)(9) of the CAA, 42 U.S.C. § 7412(a)(9), and Sections 309 and 311(a)(6) of the CWA, 33 U.S.C. §§ 1319, 1321(a)(6).

9.    Defendant is a "responsible party" for the Refinery within the meaning of Section 2702(a) of the OPA, 33 U.S.C. § 1002(a).

## STATUTORY AND REGULATORY BACKGROUND

### A.    Section 112(r) of the Clean Air Act

10.    The Clean Air Act establishes a regulatory scheme designed to protect and enhance the quality of the nation's air so as to promote the public health and welfare and the productive capacity of its population.  Section 101(b)(1) of the CAA, 42 U.S.C. § 7401(b)(1).

11.    Section 112(r) of the CAA, 42 U.S.C. § 7412(r), requires the Administrator of EPA to, among other things, promulgate a list of regulated substances with threshold quantities, and promulgate regulations applicable to the owner or operator of stationary sources at which a regulated substance is present in more than a threshold quantity that address release prevention, detection, and correction requirements for these listed regulated substances.

12.    Section 112(r)(2)(c) of the CAA, 42 U.S.C. § 7412(r)(2)(c), defines a "stationary source" as any buildings, structures, equipment, installations or substance emitting stationary activities which belong to the same industrial group, are located on one or more contiguous properties, are under the control of the same person, and from which an accidental release may occur.

13.    EPA has promulgated regulations to implement Section 112(r), codified at 40 C.F.R. Part 68, that require owners and operators of stationary sources that have more than a threshold quantity of a regulated substance in a Program 3 process to develop and implement a risk

management program that includes a management system, hazard assessment, prevention program, and submission of a risk management plan ("RMP").

14.     "Process" is defined in 40 C.F.R. § 68.3 to mean "any activity involving a regulated substance including any use, storage, manufacturing, handling, or on-site movement of such substances, or combination of these activities." "Covered process" means "a process that has a regulated substance present in more than a threshold quantity as determined under [40 C.F.R.] § 68.115." 40 C.F.R. § 68.3.

15.     "Program 3" processes are defined in 40 C.F.R. § 68.10(d).

16.     The required risk management program for owners and operators of stationary sources that have more than a threshold quantity of a regulated substance in a Program 3 process  contains the following requirements relevant to this action.

        a.      Relevant Management System Requirement. 40 C.F.R. § 68.15 requires the owner or operator of a stationary source with a Program 3 process to develop a management system to oversee implementation of the risk management program and assign a qualified person with overall responsibility for the development, implementation, and integration of the program elements. When responsibility for implementing individual requirements is assigned to persons other than the person with overall responsibility, the names or positions of these people shall be documented and lines of authority defined through an organization chart or similar document.

        b.      Relevant Hazard Assessment Requirements.

                (1)      40 C.F.R. § 68.20 requires the owner or operator of a stationary source to prepare an offsite consequence analysis ("OCA"), including a toxic worst case release scenario.

                (2)      40 C.F.R. § 68.22(c) requires the facility to use in its toxic worst case scenario the average humidity at the site unless OCA guidance tables are used.

(3)     40 C.F.R. § 68.33(a) requires that the OCA include a list of all environmental receptors within a circle with its center at the point of the release and the radius determined by the distance to the endpoint as defined in 68.22(a).

(4)     40 C.F.R. § 68.36 requires that the OCA be reviewed and updated at least once every five years.

(5)     40 C.F.R. § 68.39 requires the owner or operator to maintain records for the OCA.

c.     Relevant Prevention Program Requirements.

(1)     40 C.F.R. § 68.65 requires the owner or operator to compile written process safety information pertaining to the technology of each process including safe upper and lower limits for such items as temperatures, pressures, flows, or compositions known as Safe Operating Control Limits ("SOCLs"), as well as piping and instrument diagrams ("P&ID") and document that the equipment complies with recognized and generally accepted good engineering practices.

(2)     40 C.F.R. § 68.67(a) requires the owner or operator to conduct a process hazard analysis ("PHA") that is appropriate to the complexity of the process.

(3)     40 C.F.R. § 68.67(c) requires that the PHA address the consequences of a failure of engineering and administrative controls, and stationary source siting factors.

(4)     40 C.F.R. § 68.67(d) and (e) requires that the PHA be performed by a team with expertise in engineering and process operations, and that the owner or operator establish a system to promptly address the team's findings and recommendations, assure that they are resolved timely, develop a schedule, and document the actions to be taken.

(5)      40 C.F.R. § 68.69(a) requires the owner or operator to develop and implement written operating procedures that contain complete instructions for emergency shutdown and adequately address consequences of deviations and steps to correct deviations.

(6)      40 C.F.R. § 68.71(b) requires the owner or operator to provide refresher training for every employee involved in operating a process at least every three years.

(7)      40 C.F.R. § 68.73(d)(3)-(4) requires the owner or operator to perform and document inspections and tests on process equipment at the frequencies established by applicable manufacturers' recommendations and good engineering practices.

(8)      40 C.F.R. § 68.79 requires the owner or operator to conduct compliance audits every three years to verify that procedures and practices developed under the Prevention Program are adequate and being followed, develop a report of the findings of the audit, promptly determine and document an appropriate response to each finding, and document that deficiencies have been corrected.

(9)      40 C.F R. § 68.81 requires the owner or operator to investigate each incident which resulted in, or could have resulted in, a catastrophic release, prepare a report and establish a system to promptly address and resolve the findings, and share information with all affected personnel.

d.      Relevant Risk Management Plan ("RMP") Requirements.

(1)      40 C.F.R. § 68.155(f) requires that the RMP include in its executive summary a brief description of planned changes to improve safety.

(2)      40 C.F.R. § 68.168 and 68.42 requires the RMP to include a five year history of accidental releases from covered processes that resulted in specified on and off site consequences.

17.     Pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), the Administrator may commence a civil action against any person that is the owner or operator of an affected source, to obtain civil penalties and injunctive relief whenever such person has violated or is violating any requirement or prohibition of the CAA, including the requirements of 42 U.S.C. § 7412 and its implementing regulations, including 40 C.F.R. Part 68.

18.     Section 113(b) of the CAA, 42 U.S.C. § 7413(b), as modified by the Debt Collection Improvement Act of 1996, as implemented by the Civil Monetary Penalties Inflation Rule, 40 C.F.R. Part 19, provides that a court may award injunctive relief and impose penalties of not more than $27,500 for each violation of Section 112 and the regulations promulgated thereunder occurring from January 30, 1997, through March 15, 2004, penalties of not more than $32,500 for each such violation occurring from March 15, 2004, through January 12, 2009, and penalties of not more than $37,500 for each such violation occurring after January 12, 2009.

**B.     Sections 309 and 311 of the Clean Water Act**

19.     Section 301(a) of the CWA, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant from a point source into waters of the United States except as authorized by, and in compliance with, certain enumerated Sections of the CWA.

20.     "Pollutant" is defined as to include, *inter alia*, "chemical wastes, biological materials … and industrial . . . waste."  33 U.S.C. § 1362(6).

21.     Once discharged, "oil" is a pollutant within the meaning of Section 301 of the CWA, 33 U.S.C. § 1311(a).

22.     "Point Source" is defined as "any discernible, confined and discrete conveyance" including but not limited to any "pipe" or  "container." 33 U.S.C. § 1362(14).

23.     Section 311(b) of the CWA, 33 U.S.C. § 1321(b), prohibits the discharge of oil or hazardous substances into or upon the navigable waters of the United States or adjoining shorelines in such quantities as the President determines may be harmful to the public health or welfare or environment of the United States.

24.     Section 311(a)(2) of the CWA, 33 U.S.C. § 1321(a)(2), defines "discharge" to include "any spilling, leaking, pumping, pouring, emitting, emptying or dumping," except as specifically excluded therein.

25.     Section 311(a)(1) of the CWA, 33 U.S.C. § 1321(a)(1), defines "oil" as "oil of any kind or in any form, including petroleum, fuel oil, sludge, oil refuse, and oil mixed with wastes other than dredged spoil . . . ."

26.     Section 502(7) of the CWA, 33 U.S.C. § 1362(7), defines "navigable waters" as "the waters of the United States, including the territorial seas."

27.     Pursuant to Section 311(b)(4) of the CWA, 33 U.S.C. § 1321(b)(4), EPA has determined by regulation that discharges of oil in such quantities as may be harmful to the public health or welfare or environment of the United States include discharges of oil that "(a) Violate applicable water quality standards; or (b) Cause a film or sheen upon or discoloration of the surface of the water or adjoining shorelines, or cause a sludge or emulsion to be deposited beneath the surface of the water or upon adjoining shorelines."  40 C.F.R. § 110.3.

28.     Section 311(b)(7)(A) of the CWA, 33 U.S.C. § 1321(b)(7)(A), as modified by the Civil Monetary Penalty Inflation Adjustment Rule, 69 Fed. Reg. 7121 (Feb. 13, 2004), and EPA's 2008 Civil Monetary Penalty Inflation Adjustment Rule, 73 Fed. Reg. 75,340 (Dec. 11, 2008), and 40 C.F.R. § 19.4, provides that any person who is the owner, operator, or person in charge of an onshore facility from which oil is discharged in violation of Section 311(b)(3) of the CWA, shall be

subject to a civil penalty of up to $1100 per barrel discharged for discharges occurring from March 15, 2004, through January 12, 2009.

29.     Section 311(a)(10) of the CWA, 33 U.S.C. § 1321(a)(10), defines "onshore facility" as "any facility of any kind located in, on, or under, any land within the United States other than submerged land."

30.     Pursuant to Section 311(e)(1) of the CWA, 33 U.S.C. § 1321(e)(1), the owner or operator of the facility is subject to an injunction as may be necessary to "abate" an "imminent and substantial threat to the public health or welfare of the United States . . . because of an actual or threatened discharge of oil or a hazardous substance from a vessel or facility in violation of [Section 311(b) of the CWA, 33 U.S.C. § 1321(b)]."

31.     Section 309(b) of the CWA, 33 U.S.C. § 1319(b), authorizes EPA to commence a civil action for appropriate relief, including a permanent or temporary injunction, for any violation for which a compliance order under Section 309(a) is also possible.  Section 309(a)(3) authorizes EPA to issue compliance orders whenever it finds that any person has violated Section 301 of the CWA.

### C.     The Oil Pollution Act of 1990

32.     Section 1002(a) of the OPA, 33 U.S.C. § 2702(a), provides that "each responsible party for . . . a facility from which oil is discharged, or which poses the substantial threat of a discharge of oil, into or upon the navigable waters or adjoining shorelines . . . is liable for the removal costs and damages specified in [33 U.S.C. § 2702(b)] that result from such incident."

33.     Section 1001(32) of the OPA, 33 U.S.C. § 2701(32), defines "responsible party" to include, "[i]n the case of an onshore facility (other than a pipeline), any person owning or operating the facility . . . ."

34.     Section 1001(14) of the OPA, 33 U.S.C. § 2701(14), defines "incident" to mean "any occurrence or series of occurrences having the same origin, involving one or more . . . facilities . . . resulting in the discharge or substantial threat of discharge of oil."

35.     Section 1001(9) of the OPA, 33 U.S.C. § 2701(9), defines "facility" to mean "any structure, group of structures, equipment, or device (other than a vessel) which is used for one or more of the following purposes:  exploring for, drilling for, producing, storing, handling, transferring, processing, or transporting oil."  "Onshore facility" is defined as "any facility of any kind located in, on, or under, any land within the United States other than submerged land." 33 U.S.C. § 2701(24).

36.     Section 1001(7) of the OPA, 33 U.S.C. § 2701(7), defines "discharge" to mean "any emission (other than natural seepage), intentional or unintentional" and to include "spilling, leaking, pumping, pouring, emitting, emptying, or dumping."

37.     Section 1001(23) of the OPA, 33 U.S.C. § 2701(23), defines "oil" to mean "oil of any kind or in any form, including, but not limited to, petroleum, fuel oil, sludge, oil refuse, and oil mixed with wastes other than dredged spoil."

38.     Section 1001(21) of the OPA, 33 U.S.C. § 2701(21), defines "navigable waters" as "the waters of the United States, including the territorial sea."

39.     Section 1001(31) of the OPA, 33 U.S.C. § 2701(31), defines "removal costs" to mean "the costs of removal that are incurred after a discharge of oil has occurred or, in any case in which there is a substantial threat of a discharge of oil, the costs to prevent, minimize, or mitigate oil pollution from such an incident."  Section 1002(b)(1) of the OPA, 33 U.S.C. § 2702(b)(1), further provides that the "removal costs" referred to in Section 1002(a) of the OPA, 33 U.S.C. § 2702(a),

include "all removal costs incurred by the United States . . . under [33 U.S.C. § 1321] subsection (c), (d), (e), or (l)."

40.     Section 1001(30) of the OPA, 33 U.S.C. § 2701(30), defines "remove" and "removal" to mean "containment and removal of oil or a hazardous substance from water and shorelines or the taking of other actions as may be necessary to minimize or mitigate damage to the public health or welfare, including, but not limited to, fish, shellfish, wildlife, and public and private property, shorelines, and beaches."

41.     Pursuant to Section 1012(a) of the OPA, removal costs incurred by federal authorities such as EPA, including "[f]ederal administrative, operational, and personnel costs and expenses reasonably necessary for and incidental to the implementation, administration and enforcement of [33 U.S.C. §§ 2701 to 2761]," may be paid from Oil Spill Liability Trust Fund ("the Fund"), which is administered by the Coast Guard's National Pollution Funds Center.  33 U.S.C. § 2712(a).

42.     Section 1005(a) of the OPA, 33 U.S.C. § 2705(a), provides that the responsible party is liable for interest on the amount of response costs paid by the Fund in satisfaction of a claim.

## GENERAL ALLEGATIONS

43.     At all times relevant to this action, Defendant owned and operated the Refinery. Defendant continues to own and operate the Refinery.

44.     The Refinery is sited on approximately 300 acres in the north part of Coffeyville, is bordered on the east by agricultural property, to the north by the Verdigris River, to the west by agricultural and residential property, and to the south by various other facilities, some of which process waste or other byproducts from the Refinery.

45.     Defendant purchases crude oil and processes it at the Refinery into various petroleum products, including propane, gasoline, distillates, and petroleum coke.  This is done through a series

of refining processes, some of which use physical separation process and some of which involve chemical reactions which change the molecular structure of the petroleum hydrocarbons into higher quality and more marketable products.

46.     The Refinery is a "Stationary Source" within the meaning of Section 112(r)(2)(c) of the CAA, 42 U.S.C. § 7412(r)(2)(c).

47.     The Refinery uses a threshold quantity of a regulated substance in a "process" within the meaning of 40 C.F.R. § 68.3.

48.     The processes at the Refinery include those classified as Program 3 under 40 C.F.R. § 68.10(d)

49.     The Refinery is an "onshore facility" within the meaning of Section 311(a)(10) of the CWA, 33 U.S.C. § 1321(a)(10), and Section 1001(24) of the OPA, 33 U.S.C. § 2701(24).

## FIRST CLAIM FOR RELIEF

### Failure to Develop and Implement a Risk Management Program, in Compliance with the Requirements Set Forth in 40 C.F.R. Part 68

50.     The allegations in Paragraphs 1 through 49 are hereby re-alleged and incorporated by reference as if fully set forth herein.

51.     Defendant is subject to the requirements of Section 112(r)(7) of the CAA, 42 U.S.C. § 7412(r)(7), and the implementing regulations at 40 C.F.R. Part 68, because it is the owner or operator of a stationary source that has more than a threshold quantity of a regulated substance in a process including but not limited to the Alkylation Feed Treater System, propane storage and loading, Sat Gas North and South Units, Coker Unit, hydrogen fluoride/hydrofluoric acid (HF) Alkylation Unit, Isomerization Unit, Fluid Catalytic Cracking Unit, butanes and NFPA4 Storage, and

Continuous Catalytic Reformer Unit.  These processes have multiple regulated substances including HF, isobutane, butane, propane, ethane, isopentane, methane, pentane, and hydrogen.

52.     The Refinery's processes are subject to OSHA's PSM standard and are therefore classified as Program 3 processes pursuant to 40 C.F.R. § 68.10.

53.     40 C.F.R. § 68 requires the Defendant to develop and implement a risk management program for Program 3 processes which includes a management system, hazard assessment, prevention program, and an RMP.

a.     <u>Violations of Management System Requirements</u>

54.     Beginning on or before March 6, 2006, Defendant failed to identify and document the names or positions responsible for individual requirements and define the lines of authority through an organizational chart or similar document in violation of 40 C.F.R. § 68.15.

b.     <u>Violations of Hazard Assessment Requirements</u>

55.     Beginning on or before March 6, 2006, Defendant failed to utilize OCA guidance tables and did not use the actual average humidity data when completing the toxic worst case scenario analysis in violation of 40 C.F.R §§ 68.25(a)(2)(I), 68.22(c).

56.     On or before July 10, 2008, Defendant failed to indicate that environmental receptors were located within the toxic worst case scenario analysis in the OCA in violation of 40 C.F.R §§ 68.22(a), 68.33(a)

57.     Beginning on or before March 6, 2006, Defendant failed to review, document, and update its toxic worst case scenario analysis in its OCA at least once every five years as required by 40 C.F.R. § 68.36(a).

58.     Beginning on or before March 6, 2006, Defendant did not maintain records for the toxic worst case scenario as required by 40 C.F.R. § 68.39.

c.    Violations of Prevention Program Requirements

59.    Beginning on or before March 6, 2006, Defendant did not adequately compile and update written process safety information pertaining to the technology of each process including safe upper and lower limits for such items as temperatures, pressures, flows, or compositions known as Safe Operating Control Limits ("SOCLs") and piping and instrument diagrams ("P&ID") and document that its equipment complies with recognized and generally accepted good engineering practices in violation of 40 C.F.R. § 68.65.

60.    Beginning on or before March 6, 2006, Defendant failed to conduct a PHA that is appropriate to the complexity of the process, and did not adequately address the consequences of failure of engineering and administrative controls, and siting factors in violation of 40 C.F. R. § 68.67(a), (c)(4)-(5).

61.    Beginning on or before March 6, 2006, Defendant's PHA did not adequately and promptly address the findings and recommendations of the review team (assuring that action items were put on a schedule and resolved timely, and that the resolutions were documented) in violation of 40 C.F.R. § 68.67(e).

62.    Beginning on or before March 6, 2006, Defendant did not adequately develop and implement written operating procedures that contain complete instructions for emergency shutdown and adequately address consequences of deviations and steps to correct deviations in violation of 40 C.F.R. § 68.69(a).

63.    Beginning on or before March 6, 2006, Defendant did not provide refresher training for every employee involved in operating a process at least every three years to assure that every employee understands and adheres to the current operating procedures of the process in violation of 40 C.F.R. § 68.71(b).

64. Beginning on or before April of 2009, Defendant did not adequately perform and document inspections and tests on certain process equipment at the frequencies established in the applicable manufacturer's recommendations and good engineering practices in violation of 40 C.F.R. § 68.73(d)(3) & (4).

65. Beginning on or before March 6, 2006, Defendant did not complete a set of written responses or follow-up actions for each of the 2005 compliance audit recommendations, nor did it consistently document that the deficiencies had been corrected in violation of 40 C.F.R. § 68.79(d).

66. Beginning on or before March 6, 2006, Defendant did not investigate each incident which resulted in, or could have resulted in, a catastrophic release, prepare a report and establish a system to promptly address and resolve the findings, and share information with all affected personnel in violation of 40 C.F R. § 68.81.

d. <u>Risk Management Plan Violations</u>

67. Beginning on or before July 10, 2008, Defendant did not include in its RMP executive summary a brief description of planned changes to improve safety in violation of 40 C.F.R. § 68.155(f).

68. Beginning on or before July 15, 2008, Defendant did not include in the RMP a complete five year accident history that includes accidental releases from covered processes that resulted in specified on or off-site consequences in violation of 40 C.F.R. § 68. 168 and 68.42.

69. Unless restrained by an order of the Court, these violations will continue.

70. Pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), as modified by the Debt Collection Improvement Act of 1996, as implemented by the Civil Monetary Penalties Inflation Rule, 40 C.F.R. Part 19, Defendant is liable for civil penalties of not more than $27,500 for each violation occurring from January 30, 1997, through March 15, 2004, not more than $32,500 for each

violation occurring from March 15, 2004, through January 12, 2009, and not more than $37,500 for each violation occurring after January 12, 2009.

71.     Pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), the United States is entitled to injunctive relief for the violations set forth above.

## SECOND CLAIM FOR RELIEF

### Civil Penalties and Injunctive Relief Under Sections 309 and 311 of the Clean Water Act

72.     Paragraphs 1 through 49 are re-alleged and incorporated by reference.

73.     Beginning on June 26 and continuing through June 30, 2007, rain fell on southeast Kansas causing flooding within the Verdigris River Basin covering Kansas and Oklahoma.  On June 30, 2007, at approximately 11:15 p.m., the Verdigris River overtopped the protective levee between the Refinery and river and inundated the Refinery and the eastern portion of Coffeyville, Kansas with flood waters.

74.     On July 1, 2007, approximately 2,145 barrels of oil were discharged from three sources within the Refinery into the flood waters of the Verdigris River ("hereinafter "July 2007 Discharge").  1,919 barrels of crude oil originated from an overflow of Tank 8010, an above-ground storage tank ("AST").  Approximately 126 barrels of diesel oil were discharged from Tank 8005, another AST, after it was moved off its foundation by the flood waters.  The flooding of the Refinery's sewer system also discharged approximately 100 barrels of oily water.

75.     The July 2007 Discharge was a "discharge of oil . . . into or upon the navigable waters of the United States [or] adjoining shorelines" within the meaning of Section 311(b)(3) of the CWA, 33 U.S.C. § 1321(b)(3), and a "discharge of a pollutant" within the meaning of Section 502(12) of the CWA, 33 U.S.C. §1362(12).

76.     The July 2007 Discharge caused a film or sheen upon, or discoloration of, Verdigris River or adjoining shorelines, and caused a sludge or emulsion to be deposited into Verdigris River or upon adjoining shorelines.   As such, the July 2007 Discharge was of a quantity "as may be harmful" within the meaning of Section 311(b)(3) of the CWA, 33 U.S.C. § 1321(b)(3), and 40 C.F.R. § 110.3.

77.     The Verdigris River is a relatively permanent, flowing river that stretches over 250 miles in southeastern Kansas and northeastern Oklahoma before it flows into the Arkansas River as part of the Mississippi River watershed.  The Verdigris River supports light commercial traffic and offers recreational opportunities for boating.  It is a "navigable water" within the meaning of Section 311(b)(3) and 502(7) of the CWA, 33 U.S.C. §§ 1321(b)(3) and 1362(7).

78.     The July 2007 Discharge was from a "point source" within the meaning of Section 502(14) of the CWA, 33 U.S.C. § 1362(14).

79.     The July 2007 Discharge violated Sections 301(a) and 311(b)(3) of the CWA, 33 U.S.C. §§ 1311(a), 1321(b)(3).

80.     Unless restrained by an order of the Court, these violations will continue.

81.     Pursuant to Section 311(b)(7)(A) of the CWA, 33 U.S.C. § 1321(b)(7)(A), and 40 C.F.R. § 19.4, Defendant is liable for a civil penalty of up to $1,100 per barrel of oil discharged in the July 2007 Discharge.

82.     Pursuant to Section 309(b) of the CWA, 33 U.S.C. § 1319(b), the United States is entitled to injunctive relief restraining further violations of, and requiring compliance with, the CWA.

83.     Pursuant to 311(e)(1) of the CWA, 33 U.S.C. § 1321(e)(1), the United States is entitled to injunctive relief to prevent further discharges from the Refinery into waters of the United States, so as to abate an imminent and substantial threat to public health or welfare.

## THIRD CLAIM FOR RELIEF

### Recovery of Removal Costs under
### Section 1002(a) of the OPA

84.     Paragraphs 1 through 49 and 73 through 77 are re-alleged and incorporated herein by reference.

85.     Oil was discharged from the Refinery into or upon the navigable waters or adjoining shorelines in the July 2007 Discharge within the meaning of Section 1002(a) of the OPA, 33 U.S.C. § 2702(a).

86.     Defendant was the Responsible Party for the Refinery at the time of the July 2007 Discharge within the meaning of Section 1002(a) of the OPA, 33 U.S.C. § 2702(a).

87.     The July 2007 Discharge is an "incident" within the meaning of Section 1001(14) of the OPA, 33 U.S.C. § 2701(14).

88.     EPA Regions 6 and 7 conducted fly overs of the River and flooded area to determine the extent of oil contamination.   EPA also deployed containment booms, absorbent pads, boats portable skimmers, and vacuum trucks for clean-up.   On July 4, 2007, EPA Region 7 began with 55 clean-up technicians which increased to 104 technicians by July 17, 2007.   EPA Region 6 contractors also deployed technicians to clean up oil pools and the large swaths of oiled vegetation that were observed in the downstream flood waters, along the shore and on lands adjacent to the Verdigris River.   Region 6 contractors monitored at least seven drinking water intakes for oil along the Verdigris River and deployed containment booms to secure the drinking water intake at Nowata,

Oklahoma and to protect Lake Oologah from the migrating oil.  EPA also supervised numerous response actions undertaken by the Defendant pursuant to an Administrative Order on Consent.

89.     To date, the United States incurred "removal costs" within the meaning of Sections 1001(31), 1002(a)&(b) of the OPA, 33 U.S.C. §§ 2701(31), 2702(a)&(b), resulting from the July 2007 Discharge in the amount of $1,827,860.24 which were paid by the Fund pursuant to Section 1012(a) of the OPA, 33 U.S.C. § 2712(a).

90.     On October 29, 2010, the U.S. Coast Guard, on behalf of the Fund, sent Defendant a written request for payment in the amount of 1,827,860.24 for the removal costs paid by the Fund in connection with the July 2007 Discharge.

91.     Defendant has not reimbursed the Fund for the removal costs incurred in connection with the July 2007 Discharge.

92.     Pursuant to Sections 1002(a), 1005, and 1015 of the OPA, 33 U.S.C. §§ 2702(a), 2705 and 2715, and applicable law, Defendant is liable for all removal costs paid by the Fund as well as interest (including prejudgment interest), administrative costs, and attorneys' fees.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, the United States of America, respectfully requests that the Court:

1.     Order Defendant to immediately comply with the statutory and regulatory requirements cited in this Complaint, under the CAA, CWA and OPA;

2.     Order Defendant to take appropriate measures to correct past violations, prevent future violations, and mitigate the effects of its violations;

3.     Assess civil penalties against Defendant for up to the maximum amounts provided in the applicable statutes;

4.      Order Defendant to pay all removal costs incurred by the Fund, plus interest accruing from

the date the claim was presented to Defendant, administrative costs, and attorneys' fees; and

5.      Grant the United States such other relief as this Court deems just and proper.


                                Respectfully submitted,

                                IGNACIA S. MORENO
                                Assistant Attorney General
                                Environment and Natural Resources Division

                                ELIZABETH L. LOEB
                                Trial Attorney
                                Environmental Enforcement Section
                                Environment and Natural Resources Division
                                U.S. Department of Justice
                                P.O. Box 7611
                                Washington, DC 20044-7611
                                Telephone: (202) 616-8916
                                Facsimile:  (202) 514-4180
                                E-mail:  elizabeth.loeb@usdoj.gov

                                BARRY R. GRISSOM
                                United States Attorney
                                District of Kansas



                                **/s/ Emily Metzger**
                                EMILY METZGER
                                Assistant United States Attorney
                                Kansas State Bar No. 10750
                                1200 Epic Center, 301 N. Main
                                Wichita, Kansas 67202
                                Telephone:  (316) 269-6481
                                Facsimile: (913) 551-6541
                                E-mail: emily.metzger@usdoj.gov

OF COUNSEL:

SARAH LABODA
U.S. Environmental Protection Agency,
Region VII
901 North 5th Street
Kansas City, KS 66101

CHERYL ROSE
Senior Attorney
Water Enforcement Division
Office of Civil Enforcement - OECA
1200 Pennsylvania Ave., NW
Washington, D.C.  20460

STEPHEN C. EWART
United States Coast Guard
National Pollution Funds Center
4200 Wilson Blvd., Suite 1000
Arlington, VA 20598-7100

<u>REQUEST FOR PLACE OF TRIAL</u>

Pursuant to Local Rule 40.2, the Plaintiffs request that Wichita, Kansas be designated as the

place of trial.

**/s/ Emily Metzger**
EMILY METZGER
Assistant United States Attorney